IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PAUL BURTMAN, JR.,** | : | **No. 1:06-CV-1507** |
| **Plaintiff** | : | **JUDGE SYLVIA H. RAMBO** |
| | : | |
| **v.** | : | |
| | : | |
| **LANCE, INC.,** | : | |
| | : | |
| **Defendant** | : | |

**M E M O R A N D U M**

This matter arises out of an employment dispute.  Plaintiff Paul
Burtman, Jr., sues his former employer, Defendant Lance, Inc. ("Lance"), for
violations of the Americans with Disabilities Act, the Age Discrimination in
Employment Act, and Pennsylvania law of wrongful discharge.  Defendants moved
for summary judgment on all counts.  For the reasons that follow, the motion will be
granted in part and denied in part.

**I.      Background**

    **A.      Facts**

Because of the nature of the suit, a cast of characters is offered for
context.  Lance is in the business of manufacturing and selling snack food.  Plaintiff
was a Route Sales Representative for Lance from 1988 to 2005.  He was supervised
by Jack Wilson, Sales Manager for the Philadelphia Zone, and Scott Wagner, a
District Manager within that zone.  Tony Baker was the Operations Manager for the
zone.  Wilson's superior was Dave Gabbard, the Regional Sales Manager, who in
turn was supervised by Frank Lewis, Senior Vice President of Sales Operations.  For
the duration of the pertinent time period, Lance employed two "sales jumpers" or

sales trainees in the Philadelphia Zone, Jim Hullet and Paul Plausky.  Jumpers are not assigned a permanent route, but fill in where needed when a sales representative is away from his normal route.  They may also ride along with a sales representative if the representative needs assistance.

### 1.   **Plaintiff's Employment**

In April 1988, Plaintiff was hired to be a sales representative for Defendant.  Among the qualifications for a sales representative is the ability to "[g]et in and out of a truck, lift up to 50 pounds on a fairly regular basis, [and] be able to operate a motor vehicle safely."  (Theriault Dep. 67:19-68:3, June 5, 2007.) Plaintiff's weekly wage was $150 plus ten percent sales commission.

From 1988 to 1993, Plaintiff reported five workplace injuries to Defendant.  All injuries involved back pain.  On some occasions, he took a few days off from work to recover.  From late 2004 through April 2005, Plaintiff incurred a number of back injuries.  When he was able to work, he did with doctors' instructions that he be set to light duty, under lifting restrictions of lifting, pushing, or pulling no more than ten or fifteen pounds.  Defendant was aware of these restrictions and, at all times during which Plaintiff was on light duty, assigned a sales trainee to accompany Plaintiff on his route and do any lifting for him.[1]  It is not clear from the record which, if any, employees of Lance were aware of the reasons that Plaintiff was assigned light duty during that time.

---

[1]   Assigning a sales representative an assistant had the following results: it likely improved sales because the salesperson could get back on his normal route before being completely recovered, and customers are more likely to buy more from someone they recognize.  An assistant working with a salesperson, however, is not free to do other work for the company but still draws a $600 per week salary.  The salary is a constant cost no matter what work the assistant performs.  In the event that a trainee is not available to cover a route or provide assistance, a manager will step in.

Plaintiff made a claim for worker's compensation based on his hernia injury incurred April 26, 2005. (Pl.'s Ex. O.) Plaintiff was placed on light duty from the date of the injury until his surgery on May 18, 2005. On that date, he was placed on worker's compensation leave through July 19, 2005.[2] Plaintiff's claim and payments were handled to his satisfaction. Toward the end of his worker's compensation time off, he faxed to Tony Baker prescriptions from his doctor regarding his readiness to return to work and the restrictions under which he could perform. He returned to work in mid-July with restrictions on the amount of weight he could lift.

Jack Wilson was hired as the Lance Philadelphia Zone Manager in July 2005. He was aware that Plaintiff was returning from a leave of absence and was on light duty in mid-July. He sent assistants to help Plaintiff work his route. Neither Wilson, nor Baker, nor Wagner, nor anyone else at Lance said anything to Plaintiff about having taken worker's compensation. Wagner did, on occasion, call Plaintiff to ask how his back was feeling. Wagner asked several times in the past whether Plaintiff was considering going on disability. Wilson testified that he did not know the details of Plaintiff's health condition.

In August 2005, Wilson assigned Ron Anthony, a district sales manager, to serve as Plaintiff's lifting helper. Anthony testified that Wilson told him that "I believe that [Plaintiff is] trouble, and I want this guy watched, I want you

---

[2] Plaintiff testified that he was "pressured" to come back to work during his convalescence from hernia surgery by way of a phone call from a nurse with the worker's compensation insurance company. The nurse told him that he was going back to work. Plaintiff's doctor had not yet cleared him to return to work. The mistake appears to have arisen from a deficit of information at the insurance company. There is no evidence linking this phone call with any discriminatory action by a Lance employee or Lance itself.

to report back to me everything that goes on in that route.  Dot every I, cross every T."  (Anthony Dep. 37:11-15, June 29, 2007.)  In particular, Wilson wanted to know "what kind of condition the route was in, what the customer feedback was."  (*Id.* 38:3-7.)  Wilson did not tell Anthony why he wanted this surveillance.  Anthony said he would keep Wilson informed about their work together, including Plaintiff's attitude and the condition of his route from the trainee who had covered it while Plaintiff was on vacation during a prior week.  Wilson does not recall having had such conversations with Anthony.

Anthony reported back that many of the accounts were in terrible shape; not because of Plaintiff's service but because of the service provided in his absence by Jim Hullet.  According to Anthony, "[e]veryone . . . from the biggest account to the smallest one was glad to see [Plaintiff] back because they knew that they would, once again, receive quality service."  (*Id.* 42:5-11.)  Anthony reported to Wilson that Plaintiff was an excellent salesman and had superior interaction with the customers.

On September 1, 2005, Tony Baker sent an email, with a carbon copy to Wilson, asking about Plaintiff's status and how long he would be on light duty.  Plaintiff returned to full duty with no restrictions in mid-September 2005.  Because there was no longer a need for him to have a lifting assistant, Plaintiff worked his sales route by himself from mid-September through mid-December 2005.

On December 6, 2005, Wilson received an email containing a chart entitled "Zone Safety Review."  (Pl.'s Ex. R.)  It contained an entry for Plaintiff's worker's compensation claim, indicating that he "[p]ulled back on handtruck with vendor & felt pain in abdominal area.  Hernia."  (*Id.*)  The chart noted that the cost

of the injury, to date, was $36,900.  Plaintiff's injury is the most expensive claim on the chart.  The next most expensive claims totaled $29,250 and $19,050, respectively.  At that time, Lance had a bonus structure in place that rewarded Zone managers for increasing the safety performance of their sales representatives. Wilson's bonus was based on his performance in a number of categories, one of which was meeting his budget or coming in under-budget in a particular quarter. The cost of all worker's compensation claims in his zone was added to the expense side of his budget.  If the amount paid out for worker's compensation exceeded projected targets, Wilson's bonus was decreased accordingly.

On or around December 7, 2005, Wilson attended a dinner with Gabbard and Lewis, during which Lewis told Wilson that the Philadelphia Zone was the worst-performing zone in the country.

At or about this same time, Plaintiff won an award for increasing his sales.

## 2.    Plaintiff's Termination

It is undisputed that, while vacationing in Florida on Friday, December 9, 2005, Plaintiff placed a phone call to Wilson.  The reason for the phone call was Plaintiff's concern about who would be servicing the accounts on his route in his absence.  Wilson told Plaintiff that sales trainee Jim Hullet was covering his accounts.  Here, Wilson's and Plaintiff's recollection of the phone conversation diverge.

Wilson maintains that Plaintiff was angry that Hullet was the appointed representative for his accounts.  In the past, Hullet had not provided the same standard of service that Plaintiff was accustomed to providing, and his customers

were accustomed to receiving.  Upon returning to his route, Plaintiff had lost sales from some customers as a result.  Wilson testified that Plaintiff became angry upon hearing that Hullet was, again, visiting his customers.  He wanted Paul Plausky to attend to his route instead.  Wilson questioned whether Plausky was able to service Plaintiff's route.  Plaintiff responded loudly, "fuck you, fuck Lance, fuck this place," then hung up.

Plaintiff testified that he was not concerned about Hullet running his route and did not curse during the conversation.  He speaks loudly sometimes because he is hard of hearing, but he was not yelling in anger.  The call ended abruptly because his cell phone dropped the call.

Immediately after the first call ended, Wilson called Plaintiff back.  His call went to voice mail, and he left a message saying that because Plaintiff had cursed at him and hung up on him, Plaintiff was to report to Wilson's office upon returning from vacation on Monday morning.  Plaintiff returned Wilson's call using a different phone.  According to Plaintiff, he denied cursing and hanging up on Wilson, explaining that his cell phone had dropped the call.  Moreover, Plaintiff claims that Wilson told him that he would not be fired because Plaintiff was the only salesman increasing sales.  Wilson testified that Plaintiff was very apologetic for having cursed.  He denied having told Plaintiff that he would not be fired or that he was the only salesperson increasing sales.  Wilson instructed Plaintiff not to go out on his sales route upon his return from vacation, but to report to Wilson's office in Philadelphia.  At that time, Plaintiff understood that he was suspended from work.

Later that day, Wilson contacted Deb Smith,[3] a human resources manager for Lance, to discuss his options.  Smith instructed Wilson that he should meet with Plaintiff in the presence of another person, to have a third party witness. If Plaintiff admitted to making the insubordinate statement, Wilson could terminate Plaintiff if he so chose.  Wilson's understanding was that if Plaintiff admitted to the insubordination, Smith said that he *should* be terminated.[4]

On the morning of December 13, Plaintiff arrived at Wilson's office for the meeting.  Wilson brought Baker into his office as a witness.  Plaintiff's and Wilson's recollection of the meeting diverge.  Wilson testified that, when asked whether he said "fuck you, fuck Lance, fuck this place," Plaintiff was apologetic and admitted the statements.  Baker confirmed that Plaintiff apologized for cursing, and tried to explain that Wilson had taken the statement out of context.  Plaintiff testified that he did not apologize.

Plaintiff testified that he told Wilson that he was only concerned about his territory when he had called the Friday before.  Wilson said "you older guys cause all the trouble" or a statement to similar effect.  Wilson denies having made such a statement and Baker does not recall he did.  Wilson also said that Plaintiff had "two charges" against him, but did not specify what the "two charges" were

---

[3] Plaintiff claims that Smith and Gabbard, took part in the decision to terminate him.  The record does not support this allegation.

[4] Plaintiff submits that Lance has an employee counseling policy providing a four-step process for behavior that infringes on company policy.  It includes verbal and written warnings and ends in termination.  Lance does not require that every step be followed in every circumstance, however. Wilson testified that he follows the process routinely, unless someone is insubordinate, has stolen money from the company, or has falsified records.  The policy itself is not part of the record on summary judgment.

when Plaintiff asked.  Wilson disputes that any conversation about "two charges" occurred.

It is undisputed that Wilson terminated Plaintiff at the meeting on December 13.  The reason given on the internal Lance documentation was "insubordination."  There was no record of prior insubordination or use of profanity by Plaintiff in his employment history.  Although Wilson did not take issue with Plaintiff's sales performance, Wilson testified to his belief that terminating Plaintiff was the appropriate course because he did not want another outburst towards a fellow employee or a customer.  He felt that the outburst signaled that Plaintiff was unstable.  Upon his termination, Plaintiff was fifty-five years old.  Wilson was forty-two years old.

Immediately after Plaintiff's termination, Wilson appointed Paul Plausky to cover his route on a temporary basis.  Plausky was forty years old and did not require lifting assistance.

### 3.    Plaintiff's Administrative Charge

In or around the mid-March 2006, Plaintiff filed a Charge Information Questionnaire on a form provided by the Equal Employment Opportunities Commission ("EEOC").  He alleged "discharge" as the type of harm he suffered, on the basis of "age" and "disability."  (Pl.'s Ex. U.)  In support thereof, he stated "I was at [the] time 55 years old, and I have a chronic back problem."  (*Id.*)  In the Discipline Questionnaire that appears to have been attached, question twenty-one asks for the reason that Plaintiff believed that he was discriminated against.  He wrote, "I was 55 years old and have been off on work[er's] compensation.  April -

June 2005 for [an] on job injury.  Also [December 2004] off for chronic back pain. And light duty several times in 2005." (*Id.*)

On April 17, 2006, Plaintiff filed a Charge of Discrimination at the Maryland Commission on Human Relations.  (*Id.*)  He checked the box next to "age" in response to the query of the type of discrimination he claimed.  (*Id.*)  The "disability" box was not checked.  (*Id.*)  Plaintiff wrote "see attached" in the space provided for additional information about the discrimination.  (*Id.*)  In pertinent part, he wrote

> When I was terminated [I] was never told why just that I had 2 charges against me but was never told what they were.  I was also told that you older guys seem to give us all the problems.
> I believe I was discharged because of my age.  I was 55 years old at the time.  Lance has replaced me with a younger employee.  Lance always has open territories they are hiring for all the time.
> After 17 [years] and 8 [months] of loyal service to the company with no problems I still believe I was terminated because of my age and my health condition.

(*Id.*)

On May 11, 2006, the EEOC sent Lance a Notice of Charge of Discrimination addressed to Wilson.  It notified Wilson and Lance that Plaintiff had filed a charge of employment discrimination under the Age Discrimination in Employment Act.  (*Id.*)  Plaintiff's Charge of Discrimination was appended to the Notice and included the text set forth above.  Plaintiff was mailed his right to sue letter on May 15, 2006.  There is no evidence of record as to whether the EEOC or a state agency investigated Plaintiff's allegations in the four-day interim between sending Lance the Notice and sending Plaintiff his right to sue letter.

### 4.   **Plaintiff's Permanent Replacement**

On June 1, 2006, Clifton Moran, age fifty-four, assumed full-time responsibility for Plaintiff's former route.  Moran had been a sales representative in Maryland and bid on the open route.  He remained on the route for ten months, before successfully bidding on a more profitable route within the same sales zone.

### 5.   **Other Evidence**

Plaintiff submits additional evidence that, he argues, demonstrates the discriminatory atmosphere at Lance during and immediately after his employment there.  Lance originated as a cracker company, then purchased a potato chip company and was moving in the direction of salty snacks like potato chips.  Around September 2005, Lance began using a new slogan on new letterhead, stating "Lance, a new beginning" to signal its focus changing from crackers to salty snacks. (Gingrow Dep. 134:10-18, July 2, 2007.)  Al Gingrow, a sales manager trainee, testified that Dave Gabbard, Wilson's direct supervisor, used the term "cracker stacker" to refer to senior employees.  Gingrow thought the term "cracker stacker" was used "for the veterans of Lance, you know the old timers, who had been there for many, many years, who just sold primarily crackers." (*Id.* 54:20-56:14.)  Wilson had a different understanding of the term.  In his mind, everyone who worked at Lance was a "cracker stacker" because ninety percent of Lance's sales volume was in crackers.

Gingrow described his immediate leadership at Lance as "disappointing."  He related numerous incidents of crass conversation and ego-driven decisions among his supervisors.  He testified specifically to the volatility of Jack Wilson.  Wilson would get angry if his demands for perfect performance by his

employees were not met.  He micromanaged.  He played favorites among his district managers.  Wilson was in "all new territory" as a manager because he had "never officially managed people." (*Id.* 46:19-25.)  He was subject to a great deal of pressure from Gabbard to perform well.

Gingrow felt pressure from Gabbard as well.  On or around December 22, 2005, weeks after Plaintiff's termination, Gingrow terminated a route salesperson under his supervision named Al Meredith.[5]  Meredith was around sixty years old.  He "was very slow moving, he was overweight, he was in bad health." (*Id.* 62:22-63:4.)  Meredith missed two required deposits to the Lance bank account. Baker and Gabbard immediately called the missing deposits to Gingrow's attention. They did not respond similarly to other salespersons who missed deposits.  Gingrow addressed the issue with Meredith, who said "he was having problems with his heart and he needed to go to the hospital . . . but . . . he apologized . . . [and said] he would make the deposit." (*Id.* 67:12-18.)  When Gingrow spoke to Gabbard subsequently and informed Gabbard of Meredith's health issues, Gabbard said "that he felt that Al Meredith was a potential risk to the company because of his condition.  He felt that Al was going to abuse the system and go on disability, or go on [Worker's] Compensation.  And he basically gave me a directive because Al did not deposit his money . . . again." (*Id.* 68:5-20.)  At Lance, failing to make the required deposit three times was a terminable offense.  Upon the third strike, Gabbard called Gingrow again and said "I hope you're going to terminate this individual because

---

[5] Plaintiff offers the termination of six additional Lance employees in 2006 as circumstantial evidence of age discrimination.  The court will not consider this evidence on summary judgment because there is no indication that any of the employees were terminated because of their age.

you know he's a risk." (*Id.* 68:25-69:2.)  Gingrow fired Meredith on the day of the second phone call.

## B.   Procedural History

Plaintiff filed his complaint on August 2, 2006.  He requested relief under federal law for age discrimination, retaliation, and disability discrimination and under state law for wrongful discharge, age discrimination, disability discrimination, and retaliation.  Counsel stipulated to dismissal of a number of those claims.  (Docs. 52-53.)  The claims that remain are for disability discrimination in violation of the Americans with Disabilities Act ("ADA"), age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), and wrongful discharge.  Lance filed a motion for summary judgment and a supporting brief regarding each of those claims on September 21, 2007.  Having been fully briefed, the motion is ripe for disposition.

## II.      Legal Standard – Motion for Summary Judgment

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  *Id.* at 248.  The court must resolve all doubts as to

the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.        **Discussion**

Lance argues that 1) Plaintiff failed to exhaust his administrative remedies as to the federal claims; 2) Plaintiff cannot meet his burden of producing evidence that would support a prima facie case for disability discrimination under the ADA; and 3) Plaintiff cannot meet his burden of producing evidence that would

support his claims for age discrimination and wrongful discharge.  The court will address each argument in turn.[6]

### A.    Exhaustion of Administrative Remedies

Plaintiff's remaining federal claims in his civil complaint contains request relief 1) under the ADEA for discrimination "with respect to his compensation, terms, conditions, or privileges of employment" and termination; and 2) under the ADA for discrimination "in regard to job application procedures, hiring, advancement, discharge, employee compensation, job training, and other terms, conditions and privileges of [his] employment."  (Compl. ¶¶ 56, 60.)  Defendant submits that Plaintiff exhausted his administrative remedies with respect to a violation of the ADEA for his termination only.  His allegations of age discrimination affecting his compensation, terms, conditions, or privileges of employment and every allegation made under the ADA must fail because they were not made in the original Charge.  Plaintiff maintains, however, that all claims in his complaint were properly exhausted.[7]

A plaintiff must exhaust his administrative remedies before seeking relief in a federal court, in the context of employment discrimination cases, for

---

[6]  The court pauses to instruct the parties that, in any future submission to this court, the parties shall not change the appearance of ordinary text for emphasis.  Stylistic differentiation of headings, citations, and other aspects of court documents traditionally set off from the body of the document is permissible.

[7]  As an initial matter, Plaintiff argues proper exhaustion because his "EEOC charge, questionnaires, and narrative" sufficiently state his claim.  (Doc. 59 at 4-5.)  The recent decision in *Fed. Express Corp. v. Holowecki*, 552 U.S. —, 2008 WL 508018, at *11 (Feb. 27, 2008), suggests a modified analysis.  A "charge" under the ADEA must contain "an allegation and the name of the charged party . . . [and] it must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and employee."  *Id.* at *9.  An intake questionnaire may meet these requirements, but may not.  The court need not decide the issue.

14

"practical" reasons. *Anjelino v. New York Times Co.*, 200 F.3d 73, 87 (3d Cir. 1999) (failure to exhaust administrative remedies is not a jurisdictional bar to bringing suit under the ADA or ADEA); *see Zipes v. Trans World Airlines, Inc. Independent Federation of Flight Attendants*, 455 U.S. 385, 393 (1982). The statutory and regulatory scheme implicated when a complainant files a charge with the EEOC or a similar state agency is meant to afford "the opportunity to settle disputes through conference, conciliation and persuasion, and thereby avoid unnecessary litigation." *DeLa Cruz v. Piccari Press*, 521 F. Supp. 2d 424, 431 (E.D. Pa. 2007). The Notice of Charge to an employer provides the employer with the opportunity to take corrective action internally, without further investigation by the EEOC. *See Bihler v. Singer Co.*, 710 F.2d 96, 99 (3d Cir. 1983). If an investigation goes forward and conciliation is unsuccessful, the EEOC may issue a notice to the complainant that he is entitled to sue his employer if he chooses, because the agency finds no basis to sue on the complainant's behalf. *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984). This statutory scheme "reflects an attempt to balance the competing values of protecting the right of employees to nondiscriminatory treatment, and of avoiding the cost of litigation over discriminatory employment decisions that might be rectified by a consensual agreement." *Id.* at 237 n.9.

Upon receipt of the right to sue letter, an aggrieved yet unsatisfied plaintiff often turns to the courts for redress. In drafting his complaint, the plaintiff recalls instances of discrimination or reasons for the discrimination that were not included in his original charge of discrimination with the EEOC. This, Defendants argue, is what happened in this case.

Accordingly, the court must determine whether the claims in Plaintiff's complaint are fairly within the scope of the EEOC Charge or the investigation which could reasonably be expected to arise therefrom. *Id.* at 237; *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398-99 (3d Cir. 1976). Whether an allegation in a civil complaint is "fairly within the scope" of an EEOC charge or would likely have resulted from the EEOC's investigation depends on the strength of the nexus between the claim filed with the EEOC and the claim in the civil complaint. *Galvis v. HGO Servs.*, 49 F. Supp. 2d 445, 449 (E.D. Pa. 1999). Discriminatory actions that occur after a plaintiff filed an EEOC charge are often deemed to be fairly within the scope of the original charge because they arise out of the same set of facts contained in the first charge. *E.g., Waiters*, 729 F.2d at 238 (retaliation and discharge); *Albright v. City of Phila.*, 399 F. Supp. 2d 575, 584-85 (E.D. Pa. 2005) (retaliation).

Courts are more hesitant to allow an entirely new theory of discrimination to proceed in the civil complaint if it does not appear in a previously filed EEOC complaint. The EEOC Charge form attempts to eliminate this occurrence. It asks a complainant to identify the basis for the discrimination among race, color, sex, religion, national origin, retaliation, age, disability or other. (Pl.'s Ex. U.) The complainant is to check the appropriate box or boxes next to the bases for discrimination that he believes applies. (*Id.*) If a plaintiff does not "check the box" next to a basis for discrimination and his narrative in support of his charge does not suggest that basis, he may be precluded from filing a civil suit on that basis. *See Antol v. Perry*, 82 F.3d 1291, 1296 (3d Cir. 1996) ("The specifics of [the plaintiff's] disability discrimination charge do not fairly encompass a claim for gender discrimination merely because investigation would reveal that [he] is a man

and the two employees who received the promotions are women."); *Mullen v. Topper's Salon & Health Spa, Inc.*, 99 F. Supp. 2d 553, 556 (E.D. Pa. 2000) (dismissing a plaintiff's claim for hostile work environment due to sexual harassment because she checked the box indicating religious discrimination had occurred and her charge did not set forth facts that would support a sexual harassment claim).

Here, Plaintiff checked the box on his Charge of Discrimination indicating that the only basis for discrimination was his age. He did not check the "disability" box. His narrative describes age discrimination; he reiterates his belief that he was terminated because of his age five times. But he also states his belief that his "health condition" was an additional cause for termination. This court must conclude that a reasonable EEOC employee who read the words "health condition" in a narrative attached to a Charge would be on notice to investigate whether an ADA violation occurred. At the very least, the court would expect the employee to inquire further with the complainant as to whether he wanted to amend his Charge. Thus, the court concludes that Plaintiff's ADA claim in his complaint was exhausted.

The court cannot accept, however, Plaintiff's argument that he exhausted a claim for age or disability discrimination for any act of his employer other than discharge. Plaintiff's charge states that he was discriminated against by being terminated for an unlawful reason. There is no suggestion that he was discriminated against during his employment in a manner that affected his compensation or terms and conditions of employment. Instead, he wrote, "my "performance and evaluations were always satisfactory or better. I was never

[written] up or reprimanded.  In my almost 18 years with the company I received

numerous awards for increasing my sales."  (Pl.'s Ex. U.)  He relates that he was

told that there were two charges against him, and that he was not told what they

were, but does not allege that they were leveled against him for an unlawful reason.

He repeats: "I believe I was *discharged* because of my age."  (*Id.*)  Plaintiff now

claims, however, that Defendant violated the ADEA by discriminating against him

"with respect to his compensation, terms, conditions or privileges of employment"

because of his age.  Discrimination claims based on Plaintiff's compensation and

terms of employment are not fairly within the scope of his claim of discriminatory

discharge, nor would an EEOC investigation, reasonably conducted, likely unearth

such a claim.  A plain reading of Plaintiff's narrative suggests that he had never

experienced adverse treatment by Defendant until his termination.  Plaintiff has

failed to exhaust his administrative remedies for any claim of discriminatory

treatment other than discharge.  The court now turns to the merits of Plaintiff's

ADA, ADEA, and wrongful discharge claims.

> **B.**   **Americans with Disabilities Act**

The ADA prohibits discrimination against "a qualified individual with a

disability because of the disability of such individual."  42 U.S.C. § 12112(a).

"Merely having an impairment does not make one disabled for purposes of the

ADA."  *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 195 (2002).  A plaintiff will

receive the protections of the ADA only when he demonstrates that he has a

"disability" within the meaning of the statute.  A disability is "(A) a physical or

mental impairment that substantially limits one or more of the major life activities of

such individual; (B) a record of such an impairment; or (C) being regarded as having

such an impairment." § 12102(2).  Plaintiff alleges that he was terminated because he had a record of a disability and was regarded as disabled.

## 1.   **Record Of A Disability**

To prove that he had a record of being disabled, Plaintiff must demonstrate that he "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k).  "A mere diagnosis of a particular impairment is not enough." *Merit v. S.E. Pa. Transit Auth.*, 315 F. Supp. 2d 689, 701 (E.D. Pa. 2004).

Plaintiff makes no argument that he has been misclassified, thus his Lance personnel file is the pertinent record to determine whether he had a history of a physical impairment that substantially limited a major life activity.  29 C.F.R. pt. 1630, App. § 1630.2(k); *Taylor v. Nimock's Oil Co.*, 214 F.3d 957, 961 (8th Cir. 2000); *see* Alex B. Long, *(Whatever Happened to) the ADA's "Record of" Prong(?)*, 81 Wash. L. Rev. 669, 689-93 (2006).  It contains certain medical information, including doctors' notes and internal communications from 2004 and 2005 noting that he has had various lifting restrictions, he had surgery, and that he was on worker's compensation for a few months due to a problem in his abdomen. An on-the-job-injury investigation report states that he "pull[ed] something in his stomach" on April 26, 2005.  (Pl.'s Ex. O.)  On January 18, 2005, Lance received Plaintiff's prescription to go on light duty, with a ten pound weight restriction and a prohibition on repeated bending at the waist, accompanied by his diagnosis of lumbar stenosis.  On November 24, 2004, Lance received a prescription that Plaintiff was not to work for the following month due to spinal stenosis.  He returned to work thereafter on light duty.  Prior to 2004, the medical information in

Plaintiff's personnel file includes a few additional incidents in the late 1980s and early 1990s in which Plaintiff injured his back on the job and sustained a hernia.

## 2. Regarded As Disabled

To prove that he was regarded as disabled, Plaintiff must demonstrate either that "(1) despite having no impairment at all, the employer erroneously believes that the plaintiff has an impairment that substantially limits major life activities; or (2) the plaintiff has a nonlimiting impairment that the employer mistakenly believes limits major life activities." *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 514 (3d Cir. 2001); *see* 29 C.F.R. § 1630.2(*l*). "[T]he mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action." *Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996); *accord Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002) ("The awareness that an employee is [impaired] combined with some change in his work assignments is not enough to satisfy the 'regarded as' prong of the ADA."). "In a 'regarded as' claim, the plaintiff's actual abilities are irrelevant; what matters is how the employer perceived the plaintiff's abilities." *Merit*, 315 F. Supp. 2d at 702.

## 3. Substantial Limitation

Under the "record of" or "regarded as" arguments by which Plaintiff makes his case, he must identify the major life activity for which he had a record of or was regarded as being substantially limited. A "major life activity" is a basic function like "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). An impairment

is "substantially limiting" when the claimant is "[u]nable to perform a major life activity that the average person in the general population can perform" or is "[s]ignificantly restricted as to the condition, manner or duration under which [the claimant] can perform a particular major life activity compared to . . . the average person in the general population . . . ." § 1630.2(j)(1).  The factors for the court to consider in determining whether a plaintiff is "substantially limited" in a major life activity are "(i) [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." § 1630.2(j)(2).  Plaintiff claims that he was had a record of, or was regarded as, being substantially limited in one or more the following major life functions: walking, performing manual tasks including lifting, and working.  (Doc. 59 at 17.) The court will take each major life function asserted in turn, to discuss each as it relates to Plaintiff's "record of" and "regarded as" claim.

### a.   Walking

The evidence of record is insufficient to meet Plaintiff's burden of showing that he had a record of being substantially limited in the major life activity of walking or was regarded as being so limited.

### b.   Manual Tasks

"When addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with [his] specific job. *Toyota Motor Mfg.*, 534 U.S. at 200-01.  Often, this proof takes the form of testimony regarding whether the plaintiff

can tend to tasks involved with personal hygiene and care for a home and family. *Id.* at 202. Although Plaintiff argues that he is substantially limited in the major life activity of "manual tasks," he provides no evidentiary support to suggest that he had a record of being so limited or that Lance regarded him as being so limited.

### c.   Lifting

Being restricted in the amount of weight one may safely lift does not, without more, prove that a plaintiff is "substantially limited" with respect to the major life activity of lifting. *See Marinelli v. City of Erie*, 216 F.3d 354, 364 (3d Cir. 2000) (ten-pound limitation not substantially limiting); *Rakity v. Dillon Cos., Inc.*, 302 F.3d 1152, 1160 (10th Cir. 2002). Plaintiff's employment record contains a number of prescriptions for rest or light duty. Plaintiff's conclusory argument that, *ipso facto*, he had a record of a disability is without merit. None of these prescriptions suggest that Plaintiff was *substantially* limited when it came to lifting. They imposed rest or light duty on a temporary basis, not permanently. *See McMullin v. Ashcroft*, 337 F. Supp. 2d 1281, 1297 (D. Wyo. 2004) (temporary disability not substantially limiting for purposes of ADA). They do not indicate what, if any, the long-term impact of his injury or injuries will be. The court certainly gives credence to Plaintiff's testimony about continued pain and difficulty from his injuries; but under both the "record of" and "regarded as" prongs of the ADA, his sensory experience is not pertinent. The contents of his records and the opinions of others are what matter.

Plaintiff submits that because Lance accommodated his need for lifting assistance, Lance regarded him as being substantially limited in the major life activity of lifting. This argument is untenable. An employer's awareness of, and

22

willingness to provide assistance to, an employee with an impairment "is not enough to satisfy the 'regarded as' prong of the ADA." *Rinehimer*, 292 F.3d at 382; *accord Merit*, 315 F. Supp. 2d at 702 (It is not sufficient proof of a "regarded as" claim if an employer "knew about [a plaintiff's] impairments and granted her some extra consideration . . . , reassigned her to different work duties or placed her in a light-duty program, or disqualified her from a particular position because of her limitations." (footnotes omitted)).  Instead, the plaintiff must come forth with some proof that the employer regarded him as *substantially limited* in the major life activity of lifting.  Here, Plaintiff cannot make such a showing.  Lance provided lifting assistance when Plaintiff required it.  When Plaintiff was cleared by his doctors to return to work without limitation, Lance returned him to full duty.  There is no evidence to suggest that Lance regarded him as substantially limited with respect to lifting.

### d.   <u>Working</u>

To be "substantially limited" in "working," a plaintiff must show that he was significantly restricted in his ability to perform "either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." § 1630.2(j)(3)(i); *accord Sutton v. United Air Lines, Inc.*, 247 U.S. 506, 491-92 (1999).  Here, Plaintiff has not come forward with any evidence that he had a record of being so limited in his ability to work, or that anyone at Lance regarded him as being so limited.  *C.f. Rinehimer*, 292 F.3d at 381-82; *Rakity v. Dillon Companies, Inc.*, 302 F.3d 1152, 1161 (10th Cir. 2002) (A plaintiff's "record of missed work due

to surgery, short hospital stays, and rehabilitation does not, by itself, imply he has a record of substantial limitation in working.").

Because Plaintiff has not come forward with evidence sufficient to support a showing that he had a record of a disability or was regarded by his employer as having been disabled, summary judgment will be granted for Lance on Plaintiff's ADA claim.

## C.    Age Discrimination

To state a prima facie case for age discrimination, a plaintiff must show (1) that he is over forty years old; (2) that he was qualified, at the time of his termination, for the position in question; (3) that he suffered an adverse employment action; and (4) evidence adequate to create an inference that the employment decision was because of his age. *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 330 (3d Cir. 1995); *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996). The burden of showing a prima facie case is not intended to be onerous. *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995). If a plaintiff comes forth with sufficient evidence to support this prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The employer must produce admissible evidence which, if true, would lead a reasonable factfinder to the conclusion that the employer's decision was not motivated by an illegal motive. *Id.* at 255.

If the employer states a legitimate, non-discriminatory reason for the employment decision, the plaintiff then bears the burden of showing that the employer's reason is pretext for unlawful retaliation. *Id.* at 256. He may make this

showing by submitting evidence that allows a reasonable factfinder to infer that intentional discrimination was the more likely motivating factor, *id.*, or that the employer's proffered reason was "a *post hoc* fabrication," *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). The burden of persuading the trier of fact that the employer discriminated against the plaintiff "remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253; *accord Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

At summary judgment, the plaintiff's burden of showing pretext is to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. To do so, the plaintiff may "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder *could* rationally find them unworthy of credence and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* at 765 (internal quotations and citations omitted). It is not sufficient to show that the employer's decision was wrong, mistaken, imprudent or incompetently made. *Id.* "[T]he factual dispute at issue is whether discriminatory animus motivated the employer." *Id.*

It is undisputed that Plaintiff satisfies the first three prongs of the prima facie case for age discrimination; he is more than forty years old, he was qualified for the position as a Route Sales Representative, and he was terminated. The parties dispute whether Plaintiff has adduced evidence adequate to create an inference that

he was terminated because of his age or to establish that Lance's reason for termination was pretextual.  *See O'Connor*, 517 U.S. at 312; *Fuentes*, 32 F.3d at 765.

In *Brewer*, the Third Circuit stated that an ADEA plaintiff must demonstrate that he "was replaced by a sufficiently younger person to permit an inference of age discrimination."  72 F.3d at 330.  This method of proof was affirmed in *O'Connor*.  517 U.S. at 313 ("[T]he fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class.")  The Supreme Court cleared the way for other methods of proof as well, however, holding that an ADEA plaintiff makes out a prima facie case of age discrimination with any evidence that creates an inference that the adverse employment decision was based on illegal discrimination against the plaintiff because of his age.  *Id.* at 312.

Here, Plaintiff has demonstrated that his job was filled, if only on a temporary basis, by forty-year old Paul Plausky.  Although Plausky was a temporary replacement, Third Circuit precedent mandates that this court is "not limited to considering only [Plaintiff's] final replacement" as the age comparator for purposes of Plaintiff's prima facie case.  *Sempier*, 45 F.3d at 729.  In *Sempier*, the court looked to the age of the individual who had taken on a substantial portion of the plaintiff's responsibilities in the immediate aftermath of his termination; that person was "well over ten years younger" than the plaintiff.  This showing satisfied the fourth prong of the plaintiff's prima facie case in *Sempier*.  *Id.* at 730; *accord Smith v. Page Foam Cushioned Prods. Co., Inc.*, No. Civ.A. 04-07J, 2005 WL 2176841, at

*5 (W.D. Pa. Sept. 8, 2005).  Plausky is fifteen years Plaintiff's junior.  A fifteen-year difference in age is substantial for purposes of the ADEA.  *See Bennington v. Caterpillar, Inc.*, 275 F.3d 654, 659 (7th Cir. 2001) (ten-year age gap presumptively substantial).  Accordingly, Plaintiff has met his light burden of showing a prima facie case of age discrimination.

Lance submits that it terminated Plaintiff not because of his age, but because he was insubordinate to Jack Wilson.  This is a legitimate, non-discriminatory reason for termination.  Thus Plaintiff is required to show evidence that could lead a reasonable jury to conclude that this reason is pretext for the true, discriminatory, motivating force behind the decision.

On this motion for summary judgment, where there is a contest of fact, the court must accept as true the version proffered by the non-moving party.  Thus, the court must accept Plaintiff's testimony that he did not curse at Wilson on the telephone and that he did not later admit to cursing at Wilson.  To a limited extent, whether Plaintiff cursed is inconsequential; the questions are 1) whether Wilson's impression of what he thought Plaintiff said led him to terminate Plaintiff or 2) whether Wilson terminated him because of his age.  *Brewer*, 72 F.3d at 332 ("[A]n employer may have any reason or no reason for discharging an employee so long as it is not a discriminatory reason.")  However, if a jury were to believe Plaintiff's account of the phone calls, it could infer that Wilson fabricated Plaintiff's allegedly insubordinate statements to provide him with non-discriminatory cover for terminating Plaintiff because of his age.

The court must also accept Plaintiff's testimony that Wilson said something to the effect of "you older guys cause all the trouble."  Wilson was the

person who decided to terminate Plaintiff and the comment was said during the meeting at which Plaintiff was terminated.  It was not a "stray remark" made by an executive distant from the employment decision.  *C.f. id.* at 333.  The comment is therefore probative evidence of whether the decision to terminate Plaintiff was motivated by the illegal criterion of age discrimination.[8]

Plaintiff has also proffered the testimony of Al Gingrow that Wilson's decision could have been the result of a rash management style, not discrimination.  Ultimately, the factual questions that persist on this claim require submission to a jury.  Defendant's motion will be denied as to Plaintiff's ADEA claim.

### D.   **Wrongful Discharge**

A plaintiff alleging wrongful discharge in Pennsylvania must show 1) that he engaged in a protected activity; 2) the employer took an adverse employment action contemporaneously or thereafter; and 3) that a causal link exists between the employee's protected activity and the employer's adverse action.  *Landmesser v. United Air Lines, Inc.*, 102 F. Supp. 2d 273, 277-78 (E.D. Pa. 2000).  Lance does not dispute that Plaintiff engaged in the protected activity of filing a claim for and taking worker's compensation, *see Reifer v. Colonial Intermed. Unit 20*, 462 F. Supp. 2d 621, 640 (M.D. Pa. 2006), and was terminated.  Lance argues, however, that Plaintiff is without evidence sufficient to demonstrate the third prong.

Causal connection may be demonstrated by a "broad array of evidence." *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) (quoting *Farrell v.*

---

[8]  Plaintiff argues, briefly, that this statement standing alone is sufficient to trigger the direct evidence paradigm stated in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); *accord Fakete v. Aetna, Inc.*, 308 F.3d 335, 338-39 (3d Cir. 2002).  Because this claim survives summary judgment under the burden-shifting *McDonnell Douglas* test, the court need not address *Price Waterhouse*.

*Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000)).  "In certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection."  *Id.*; *see Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (two days between protected activity and discharge).  When the protected action and the adverse employment decision are more distant in time, however, a plaintiff must adduce other types of evidence that would permit a reasonable jury to find causation.  *Marra*, 497 F.3d at 302.  This evidence may include a pattern of antagonism toward the plaintiff during the intervening time period.  *Robinson v. S.E. Pa. Transp. Auth.*, 982 F.2d 892, 895-96 (3d Cir. 1993).  Each instance of antagonism need not be sufficient to support the inference of causation; the court must consider them collectively.  *Marra*, 497 F.3d at 303; *Christman v. Cigas Machine Shop, Inc.*, 293 F. Supp. 2d 538, 544 (E.D. Pa. 2003).

   Plaintiff began worker's compensation leave on May 18, 2005.  He was discharged on December 13, 2005.  This seven-month stretch of time, on its face, does not create the presumption that Lance discriminated against Plaintiff for having taken worker's compensation.  But among the "broad array of evidence" Plaintiff has presented in support of his prima facie case is the following:  Wilson began working at Lance in July 2005.  He knew that Plaintiff was on a leave of absence from work and returned to limited duties in mid-July.  The evidence suggests that Wilson did not know, at that time, that Plaintiff had taken worker's compensation leave.  Yet Wilson instructed Anthony to "watch" Plaintiff while acting as his lifting helper upon Plaintiff's initial return to work in July because he thought Plaintiff was "trouble."

On or about December 6, 2005, Wilson received information regarding Plaintiff's having taken worker's compensation and the amount it cost Lance and Wilson's sales zone. Wilson's bonus structure was at least somewhat dependent upon that cost. The following day, Frank Lewis, the Senior Vice President of Sales for Lance and Wilson's supervisor's supervisor, informed Wilson that his zone was the worst-performing zone in the United States. Plaintiff has shown sufficient facts to support a finding that poor performance was, in part, because of the amount of worker's compensation claims. Wilson was under pressure to improve the outlook for his zone. Within days, Wilson terminated Plaintiff's employment. A reasonable jury could string together the inference that Wilson's decision to terminate Plaintiff was at least partly motivated by a retaliatory impulse for Plaintiff's having filed an expensive worker's compensation claim.

Here, too, Lance's legitimate, non-discriminatory reason for having terminated Plaintiff is that he was insubordinate. As related above, there is a fact question as to whether this reason is worthy of credence. The evidence in support of the causation element support a finding that Lance's reason is pretextual. Moreover, there is testimony that Wilson was subject to certain pressures from Gabbard, his direct supervisor. There is testimony that Gabbard wanted people who had taken worker's compensation, or were likely to do so, to be terminated. Though Gabbard was not the decisionmaker for Plaintiff's termination, a reasonable jury could find that his attitude informed Wilson's decision. The matter is in sufficient dispute that Lance is not entitled to judgment as a matter of law.

**IV.**        <u>**Conclusion**</u>

       For the foregoing reasons, Defendant's motion for summary judgment will be granted in part and denied in part.  The motion will be granted as to Plaintiff's ADA claim, but denied in all other respects.  An appropriate order will issue.

                            s/Sylvia H. Rambo
                           SYLVIA H. RAMBO
                           United States District Judge

Dated:  March 17, 2008.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PAUL BURTMAN, JR.,** | : | **No. 1:06-CV-1507** |
| **Plaintiff** | : | **JUDGE SYLVIA H. RAMBO** |
| **v.** | : | |
| **LANCE, INC.,** | : | |
| **Defendant** | : | |

# O R D E R

In accordance with the foregoing memorandum of law, **IT IS HEREBY ORDERED THAT** Defendant's motion for summary judgment (Doc. 55) is **GRANTED** in part and **DENIED** part.

1) The motion is **GRANTED** as to Plaintiff's ADA claim.

2) The motion is **DENIED** in all other respects.

3) Defendant's motion for oral argument on the motion for summary judgment (Doc. 62) is **DENIED AS MOOT**.

4) The remaining case management deadlines are as follows:

| | |
|---|---|
| Motions *in limine* & supporting briefs | May 12, 2008 |
| Motions *in limine* response | May 22, 2008 |
| Motions *in limine* reply | May 29, 2008 |
| Pretrial memoranda, proposed *voir dire* & proposed jury instructions | June 12, 2008 by noon |
| Pretrial Conference | June 19, 2008 at 10:00 AM |
| Jury Selection/Trial Date | July 7, 2008 at 9:30 AM |

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated:  March 17, 2008.